06-5397-cv
Porina v. Marward Shipping Co., Ltd.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: December 17, 2007                                    Decided: April 1, 2008 )

Docket No. 06-5397-cv

_____

VICTORIJA PORINA, as personal representative of Arnis Porins,
deceased, LUBOVA BOILOVICA, as personal representative of
Victor Boilovic, deceased, JEKARETINA JEMELIGANOVA, as
personal representative of Vladimir Lisenko, deceased, KARLIS
PUKITIS, as personal representative Ignus Pukitis, deceased,
MARTIN ZAKALOVSKIS, as personal representative of Janis
Zakalovskis, deceased, TAMARA NAZAROVA, as personal
representative of Igors Nazarovs, deceased and SIA "BUTE",

*Plaintiffs-Appellants*,

v.

MARWARD SHIPPING CO., LTD.,

*Defendant-Appellee*.

_____

Before: JACOBS, *Chief Judge*, CALABRESI, and RAGGI, *Circuit Judges*.

_____

Appeal from an August 24, 2006 order of Judge Patterson in the United States District Court

for the Southern District of New York, dismissing the complaint for lack of personal jurisdiction.

Affirmed.

MEGAN BENETT (Paul S. Edelman, *on the brief*), Kreindler & Kreindler, New York, N.Y., *for Plaintiffs-Appellants*.

JOHN D. KIMBALL, Blank Rome LLP, New York, N.Y., *for Defendant-Appellee*.

_____

CALABRESI, *Circuit Judge*:

In May 2004, a Latvian fishing vessel called the *Astrida* sank in Swedish waters; the vessel was lost and its six crew members perished. Plaintiffs, the owner of the *Astrida* and representatives of the deceased fishermen, brought suit in the Southern District of New York against Marward Shipping Co. ("Marward"), the owner of a ship called the *Vladimir*. Plaintiffs assert that the *Vladimir* struck the *Astrida*, and that the collision resulted from the negligence of those operating the *Vladimir*. Marward, instead, maintains that the *Vladimir* had nothing to do with the accident. We do not, however, consider that question, because we hold that the federal district court could not, consistently with the Constitution's guarantee of due process, exercise personal jurisdiction over Marward.

## BACKGROUND

### I. Facts

The *M/V Vladimir* is a cargo ship.[1] Before Marward purchased the *Vladimir*, the vessel was owned by a Cypriot company called Florani Shipping Co. ("Florani"). On September 20, 2002, Florani time-chartered the *Vladimir* to a Maltese company called Ambery Maritime Ltd.

_____

[1] Until May 12, 2004, the *Vladimir* was named *M/V Salvador*. For simplicity, we refer to the ship as the *Vladimir* throughout.

("Ambery"). The charter gave Ambery the use of the *Vladimir*'s cargo-carrying capacity, and the right to direct the ship's course "for worldwide trading in Charterers' option via good, safe, berth(s)/good, safe port(s)." The contract listed the intended area of service as: "U.S. Gulf, Carribbian [sic] Sea, U.S. East Coast/Canada, North Continent, United Kingdom and Baltic ports including Gulf of Finland and St. Petersburg, Russia." While subject to the 2002 charter, the *Vladimir* sailed as one of seven "specialized multipurpose vessels dedicated to U.S. trade"; these vessels comprised a carrier fleet advertised as "the only direct non-stop liner service to Russia from USA." The *Vladimir* docked over sixty times in the United States between April 2000 and March 2004.

Marward has its sole place of business in Limassol, Cyprus, and is incorporated under Cypriot law. On March 29, 2004, six weeks before the *Astrida* sank, Marward bought the *Vladimir* from Florani. The purchase was subject to the 2002 charter with Ambery, which remained in effect until June 2004. When ownership was transferred to Marward, the *Vladimir* was in port at St. Petersburg. The ship continued its transatlantic service three days later and again set off for the United States. After calling at Baltimore between April 16, 2004, and April 27, 2004, the *Vladimir* sailed back across the Atlantic to Russia, via Denmark.

On May 10, 2004, during the *Vladimir*'s first return voyage to Russia under Marward's ownership, the *Astrida* sank on the Baltic Sea. After the alleged collision, the *Vladimir* arrived as scheduled at St. Petersburg. The Maritime Administration of Latvia ("MAL"), suspecting that the *Vladimir* was involved in the accident, asked the St. Petersburg Port State Control Inspectorate to examine the ship's hull. Having done so, the Russian investigators stated that they saw no evidence of a recent collision. The Latvian authorities, not satisfied with this answer, then asked if they could

come to St. Petersburg themselves to conduct a second inspection. This request was denied by the Harbormaster of St. Petersburg because "a repeated inspection of the hull of *m/v V[LA]DIMIR* would cause the vessel's demurrage and losses to its owner since the vessel had already received permission to leave the port, and, therefore, it was offered to the representatives of the MAL to perform the inspection at the next port of call."

The next port of call was Baltimore. There, the MAL, accompanied by representatives of Marward, the United States Coast Guard, and divers from private companies, conducted a full investigation. The *Vladimir*'s master produced no course records for the period relevant to the alleged collision, declaring that "the course recorder did not operate due to technical reasons." Nevertheless, the inspectors concluded that the *Vladimir* and the *Astrida* had, in fact, collided. The report noted hull damage that was consistent with impact against the port side of the *Astrida*, including "[m]aroon dashes" that "could only be left by a foreign body" and were "visually the same colour" as the *Astrida*'s hull.

After the inspection, the *Vladimir* continued its transatlantic journeys. When, in June 2004, the Ambery charter expired, Marward entered into a similar arrangement with another charterer. While under Marward's ownership, but always at the direction of its charterers, the vessel called at United States ports at least sixteen times between March 29, 2004, and September 22, 2005.[2]

---

[2] The *Vladimir* called at Baltimore, Maryland on April 16 and June 3, 2004; at Charleston, South Carolina on June 9, 2004; at Miami, Florida on June 14, 2004; at Houston, Texas on June 18, August 14, October 21, December 28, 2004, March 9, May 22, 2005; at Mobile, Alabama on December 19, 2004, and March 5, 2005; at New Orleans, Louisiana on May 11, 2005; at Newport News, Virginia on July 30, 2005; at Fairless Hills, Pennsylvania, on August 17, 2005; and at Philadelphia, Pennsylvania on August 22, 2005.

**II. Procedural Background**

Seeking damages for wrongful death and for the loss of the *Astrida*, plaintiffs brought suit in the Southern District of New York on June 16, 2005 against various parties; they did not at first include Marward. On September 22, the plaintiffs filed a motion to amend the complaint to add Marward. The motion was granted with Marward's consent, and the other parties were subsequently dropped from the case.

Marward then moved to dismiss the complaint for lack of personal jurisdiction.[3] Judge Patterson granted the motion, concluding that plaintiffs had failed to make a prima facie showing that Marward had sufficient contacts with the United States to justify the assertion of personal jurisdiction.[4] *Porina v. Marward Shipping Co., Ltd.*, No. 05 CIV. 5621, 2006 WL 2465819 (S.D.N.Y. Aug. 24, 2006). This appeal followed.

**DISCUSSION**

We review de novo a district court's decision to dismiss a complaint for lack of personal jurisdiction. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). Where, as here, a district court relies on the pleadings and affidavits, and chooses not to conduct a "full-blown evidentiary hearing," plaintiffs need only make a prima facie showing of personal jurisdiction over

---

[3] In the alternative, Marward moved before the district court to dismiss the complaint pursuant to the doctrine of *forum non conveniens*, asserting that Cyprus was a more appropriate forum for the suit. The district court did not find it necessary to rule on this motion.

[4] The district court initially rendered its decision based solely on the pleadings and affidavits, but afforded plaintiffs sixty days to conduct jurisdictional discovery. The court then reviewed letters from counsel setting out the fruits of this discovery. Finding that plaintiffs had not adduced adequate grounds for the court to change its decision, Judge Patterson granted the motion to dismiss.

the defendant. *Id.* (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). In reviewing the dismissal, we construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor. *Id*.

Plaintiffs do not assert that Marward has sufficient contacts with the state of New York to fall within the purview of that state's long-arm statute. Instead, plaintiffs rely on Federal Rule of Civil Procedure 4(k)(2):[5]

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Rule 4(k)(2) was specifically designed to "correct[] a gap" in the enforcement of federal law in international cases. Fed R. Civ. P. 4 advisory committee's note, 1993 Amendments. The gap arose from the general rule that a federal district court's personal jurisdiction extends only as far as that of a state court in the state where the federal court sits. Before the 1993 amendments, even where a state's long-arm statute would have permitted jurisdiction, the majority of courts to consider the question took the view that former Federal Rule of Civil Procedure 4(e) required a "lockstep" approach to the question of whether a federal court could, consistently with due process, exercise personal jurisdiction over a non-resident defendant. *See United Rope Distribs., Inc. v. Seatriumph Marine Corp.*, 930 F.2d 532, 535 (7th Cir. 1991). On the "lockstep" view, federal district courts

---

[5] The text of Rule 4(k)(2) was amended, effective December 1, 2007, "as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." Fed. Civ. P. 4 advisory committee's note, 2007 amendment. Because these changes "are intended to be stylistic only,"*id.*, we refer solely to the new version.

could look only to the defendant's contacts with the individual state where the federal court was located, and not to any other contacts with the United States. *See, e.g.*, *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1264-69 (5th Cir. 1983). The pre-1993 Rules, the Advisory Committee noted, left a significant lacuna "when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction." Fed R. Civ. P. 4 advisory committee's note, 1993 Amendments.

Accordingly, Rule 4(k)(2) now allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be "subject to jurisdiction in any state's courts of general jurisdiction"; and (3) the exercise of jurisdiction must be "consistent with the United States Constitution and laws." Plaintiffs' suit relies on general maritime law; their claim, therefore, is one that "arises under federal law" for the purposes of Rule 4(k)(2).[6] *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 723 (5th Cir. 1996); *Norvel Ltd. v. Ulstein Propeller AS*, 161 F. Supp. 2d 190, 200 (S.D.N.Y. 2001). But defendant contends, and the district court concluded, that the Fifth Amendment's due process clause bars the exercise of personal jurisdiction. *See Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment.").

[6] Marward contends that plaintiffs have failed to show that Marward is not subject to personal jurisdiction in any of the fifty states. Given our conclusion on the due process issue, we do not find it necessary to decide whether the second requirement for Rule 4(k)(2) jurisdiction is met.

Due process permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). To determine whether this is so, we apply a two-step analysis in any given personal jurisdiction case. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996). First, we ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction. *See id.* In the case before us, the question is whether Marward has sufficient affiliating contacts with the United States in general, rather than with New York in particular, with which it has none. *See Dardana*, 317 F.3d at 207; *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998). If the defendant has sufficient minimum contacts, we proceed to the second stage of the due process inquiry, and consider whether the assertion of personal jurisdiction "is reasonable under the circumstances of the particular case." *Metro. Life*, 84 F.3d. at 568. A defendant's contacts with the particular federal district in which the suit was filed, or lack thereof, may be relevant in determining, at the second stage of the analysis, whether it would be reasonable, in all the circumstances, to exercise personal jurisdiction. *See* Fed. R. Civ. P. 4 advisory committee's note, 1993 Amendments.

The constitutional minimum contacts inquiry for personal jurisdiction requires us to distinguish between two forms of jurisdiction. *See* Arthur T. von Mehren & Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv. L. Rev. 1121, 1136 (1966). *Specific* jurisdiction exists where a forum exercises personal jurisdiction over a defendant "in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). A court's *general* jurisdiction over a non-resident, on

the other hand, is based on a defendant's general business contacts with the forum, and "permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Metro. Life*, 84 F.3d at 568.

Plaintiffs make no serious attempt to show that their suit either arises out of, or is related to, Marward's contacts with the United States. Accordingly, plaintiffs must satisfy the "more stringent minimum contacts test" for general jurisdiction cases, by showing that Marward had "'continuous and systematic general business contacts'" with the United States. *Id.* (quoting *Helicopteros,* 466 U.S. at 416); *see also Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445-46 (1952).

In general jurisdiction cases, we "examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed." *Metro. Life*, 84 F.3d at 569. In building their case that Marward had continuous and systematic contacts with the United States, plaintiffs rely primarily on the *Vladimir*'s repeated visits to various ports on the Eastern Seaboard and the Gulf Coast, both before and after the *Astrida* sank. But the Supreme Court has read the Constitution to require, as a minimum prerequisite to the assertion of jurisdiction, "some act by which the defendant *purposefully* avails itself of the privilege of conducting activities within the forum." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (emphasis added); *see also International Shoe*, 326 U.S. at 320 (recognizing general jurisdiction where availment is "systematic and continuous."). The difficulty with plaintiffs' reliance on the *Vladimir*'s American port visits is that none of the visits were made at Marward's direction. The decision to bring the *Vladimir* to the United States was made, in each case, by the ship's charterers, who were free under the charters to take the ship to any safe port in the world. The unilateral activities of third

parties — here, the charterers — cannot, in themselves, satisfy the requirement of contact with the forum. *Id.*

While conceding that the visits were made at the charterers' direction, plaintiffs nevertheless maintain that Marward purposefully availed itself of the advantages of doing business in the United States, thus invoking the benefits and protections of its laws. Marward, plaintiffs say, bought the *Vladimir* in the knowledge that the ship had visited, and was likely to continue visiting, the United States. Thus, plaintiffs have certainly shown that Marward could reasonably expect that its ship would have repeated contacts with the United States. But "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980). That Marward foresaw that the *Vladimir* would visit the United States does not, without more, establish that Marward purposefully engaged in the continuous and systematic business contacts with this country that are needed to support general personal jurisdiction. And, significantly, the ship's contacts with the United States could transpire, or not, at the charterers' sole discretion.

In a similar vein, plaintiffs note that the financial benefits of the charterers' course of business in the United States accrued to the ship's owner. By the terms of the charters, however, Marward was entitled to receive the same financial benefit regardless of where the charterers directed the vessel. The fact that the ship's *charterers* repeatedly made money from business in the United States does not suffice as a basis for a finding of continuous and systematic contacts on *Marward*'s part. *See id*. at 299 ("[F]inancial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State.").

The Sixth Circuit's decision in *Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214 (6th Cir. 2006), is easily distinguishable. There, the court held that personal jurisdiction was proper under Rule 4(k)(2) over the Norwegian owners of a chartered vessel, on a claim for cargo damaged on Lake Erie and delivered to Toledo, Ohio. But the defendants in that case had manifested their intent to serve and to profit from the United States in particular, by confirming in the charter agreement that "'the vessel is suitable for Toledo,'" and by outfitting and rigging the ship for the fresh water of the Great Lakes. *Id.* at 221. These facts were deemed sufficient to show that the *Fortis* defendants, unlike Marward, had purposefully availed themselves of the benefits of doing business in the forum. Moreover, *Fortis* involved a claim that arose out of the ship's contacts with the United States, and hence entailed the application of the less stringent test applicable to assertions of *specific* jurisdiction. *Id.* at 223. The plaintiff in *Fortis* was not required to show, as plaintiffs are in this case, that the ship owner engaged in continuous and systematic business contacts with the forum.

To resolve the case before us, we need not determine whether, and in what circumstances, a court might assert *specific* jurisdiction over the owner of a ship whose charterer directs it to the United States. We hold, however, that the owner of a vessel may not constitutionally be subjected to personal jurisdiction with respect to an *unrelated* suit merely because, as the owner may have expected, the vessel has repeatedly visited the forum's ports at the sole direction of its charterers.

In addition to the *Vladimir*'s stops in the United States, plaintiffs also point to the Baltimore hull inspection, in which Marward itself participated. This isolated incident, we conclude, is inadequate to support a finding of continuous and systematic general business contacts with the United States. Marward, moreover, did not *purposefully* avail itself of the benefits of conducting

activities in the United States when it sent representatives to Baltimore. Baltimore simply happened to be the vessel's next charterer-directed port of call. Because Marward's visit to Baltimore was born, not of a voluntary decision to do business in America, but of the necessity of defending itself in this dispute, the inspection provides no basis for a finding of the requisite contacts.

We conclude that Marward's contacts with the United States do not satisfy the heightened minimum contacts requirement for general jurisdiction over a non-resident. As a result, we need not consider whether personal jurisdiction would be "reasonable" in the particular circumstances of the case. *See Metro. Life*, 84 F.3d at 568 ("[I]f the constitutionally necessary first-tier minimum is lacking, the inquiry ends.").

## CONCLUSION

The assertion of personal jurisdiction over Marward with respect to this suit would not be "consistent with the United States Constitution." *See* Fed. R. Civ. P. 4(k)(2)(B). Accordingly, we **AFFIRM** Judge Patterson's decision to dismiss the complaint.