CHLOÉ, a Division of Richemont North America, Inc., Chloé, S.A., Plaintiffs–Appellants,

ABC, Plaintiff,

v.

QUEEN BEE OF BEVERLY HILLS, LLC, Rebecca Rushing, also known as Rebecca Grelier, Mohamad Alexander Zarafshan, also known as Alexander Zar, Jennifer Suns, Sun–Eye Productions, Inc. Def, 2–20 John Does, Defendants,

Simone Ubaldelli, Defendant–Appellee.

Docket No. 09–3361–cv.

United States Court of Appeals, Second Circuit.

Argued: March 23, 2010.

Decided: Aug. 5, 2010.

Milton Springut (Tal S. Benschar, on the brief), Kalow & Springut, L.L.P., New York, NY, for Plaintiffs–Appellants Chloé, et al.

Michael Konopka, Esq., New York, NY, for Defendant–Appellee Simone Ubaldelli.

David H. Bernstein, Christopher J. Hamilton, Debevoise & Plimpton LLP, New York, NY; Steven B. Pokotilow, Stroock & Stroock & Lavan LLP, New York, NY; John W. Crittenden, Cooley Godward Kronish LLP, San Francisco, CA, for Amicus Curiae International Trademark Association.

Before RAGGI and HALL, Circuit Judges, and CARMAN, Judge.*

HALL, Circuit Judge:

Plaintiffs–Appellants Chloé and Chloé, S.A. (together, "Chloé") brought suit in United States District Court for the Southern District of New York (Holwell, *J.*) against, *inter alios,* Defendant–Appellee Simone Ubaldelli ("Ubaldelli") (collectively, "Defendants").[1] The amended complaint alleged violations of sections 32(1) and 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.,* and New York General Business Law § 349 (McKinney 2004), as well as common law trademark infringement and unfair competition. Chloé moved for summary judgment on liability and Ubaldelli cross-moved to dismiss for lack of personal jurisdiction. The district court granted Ubaldelli's motion and denied Chloé's motion as moot. On appeal, Chloé argues that jurisdiction over Ubal-

---

\* The Honorable Gregory W. Carman of the United States Court of International Trade, sitting by designation.

1. Ubaldelli is the only remaining defendant-appellee before the Court. Defendants Queen Bee and Rebecca Rushing declared bankruptcy and the action was stayed against them. Chloé settled its claims against defendants Sun–Eye Productions and Jennifer Suns. Chloé's claims against Mohamad Alexander Zarafshan were resolved on default.

delli comports with New York's long-arm statute, N.Y. C.P.L.R. § 302(a) (McKinney 2001), and with due process. We agree and hold that Ubaldelli's single act of shipping an item into New York combined with the substantial business activity of Queen Bee, the entity with which Ubaldelli was affiliated, involving New York, give rise to personal jurisdiction over Ubaldelli. Accordingly, we vacate the judgment of the district court and remand the case for further proceedings.

## I. BACKGROUND

### A. *Facts*

Chloé, which refers both to the Plaintiff–Appellant that is a division of Delaware corporation Richemont North America, Inc. ("Chloé NA"), and has its principal place of business in New York and to the Plaintiff–Appellant that is a French corporation ("Chloé SA") and has its principal place of business in Paris, is a fashion company that sells women's clothing and accessories. Chloé SA is the owner of a trademark registration for the word mark CHLOÉ for handbags. Chloé NA is the exclusive U.S. licensee of the CHLOÉ trademark for all Chloé branded goods. In 2005, Chloé was selling leather handbags for approximately $1,600 in Chloé's boutiques and as the suggested retail price for its wholesale accounts. Defendants sold counterfeit copies of this handbag on their website (www.queenbeebeverlyhills. com) for $1,200, plus shipping. Defendant Queen Bee of Beverly Hills, LLC ("Queen Bee"), is an Alabama LLC. Defendants Rebecca Rushing ("Rushing") and Ubaldelli were the principals and operators of Queen Bee. The company maintained showrooms in and shipped goods from Beverly Hills, California, and Huntsville, Alabama. Defendants maintained two websites with nearly identical URLs, and both sites directed users to the same content.

The sites advertised "trunk shows" across the country, offered to sell handbags purportedly manufactured by various name-brand designers—including Chloé—and offered to ship bags anywhere in the continental United States and to select locations worldwide. Specifically, the website permitted a customer viewing the handbags to "Click here . . . to purchase this item." It then provided both a telephone number customers could call to make credit card payments and an interface through which customers could pay for their orders online through PayPal.

Chloé first became aware of Queen Bee in mid-December 2005 when it obtained records and testimony in a separate action against an internet vendor located in Naperville, Illinois, which was selling counterfeit goods and identified Queen Bee as its supplier. Ubaldelli had primary responsibility for obtaining the handbags sold by Queen Bee. Ubaldelli's main source of the handbags was a man named "Guido" who met with Ubaldelli in Queen Bee's Beverly Hills showroom. Ubaldelli placed orders with Guido, and the items were delivered to his Beverly Hills office from which Ubaldelli would then ship the merchandise to Rushing in Alabama or to customers as directed by Rushing. Ubaldelli wrote out and signed checks to pay Guido.

In December 2005, an administrative assistant at Chloé's law firm, Kalow & Springut LLP, accessed the Queen Bee website and placed an order online for the bag to be sent to her New York address. At the direction of an attorney, the assistant ordered a "Chloé" handbag for $1,200, plus $40 shipping. The bag was shipped to her in the Bronx via FedEx. The shipping label bore Ubaldelli's Beverly Hills address. The handbag was later determined to be counterfeit.

Defendants engaged in substantial sales of counterfeit CHLOÉ brand products. For example, Defendants sold at least thirty counterfeit Chloé bags to the Naperville, Illinois company. Documents also show that Defendants sold at least thirty-eight other Chloé bags to other customers around the country and made at least fifty-two sales of non-Chloé merchandise into the State of New York.[2]

In November 2006, plaintiffs filed an amended complaint against Ubaldelli and five other named defendants. The complaint alleged violations of sections 32(1) and 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*, and New York state law. A year later, Ubaldelli moved to dismiss the case against him on the basis that the court lacked personal jurisdiction over him. Shortly thereafter, Chloé moved for partial summary judgment on its trademark infringement claims. The district court granted Ubaldelli's Rule 12(b)(1) motion and denied Chloé's motion as moot. *Chloé v. Queen Bee of Beverly Hills, LLC*, 571 F.Supp.2d 518 (S.D.N.Y. 2008) (hereinafter *"Chloé I"*). Plaintiffs moved the court to certify Ubaldelli's dismissal as final under Fed.R.Civ.P. 54(b), *see Chloé v. Queen Bee of Beverly Hills, LLC*, 630 F.Supp.2d 350 (S.D.N.Y.2009) (hereinafter *"Chloé II"*). Final judgment was entered on July 8, 2009. This appeal followed.

### B. *Standard of Review*

 "We review *de novo* a district court's decision to dismiss a complaint for lack of personal jurisdiction." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir.2008). "[P]laintiffs need only make a prima facie showing of personal jurisdiction over the defendant[,][and] . . . we con-

strue the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.* In the instant case, the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held. Accordingly, "plaintiff[s'] *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996) (internal quotation marks omitted and second alteration in original).

### C. *Relevant Law*

 To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, the Court must engage in a two-step analysis. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243–44 (2d Cir.2007). First, we apply the forum state's long-arm statute. *See id.* at 244; *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir.2004). New York's long-arm statute provides:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state . . .; or 3. commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from

---

2. It is not clear from the record whether and to what extent these sales involved legitimate versus counterfeit merchandise.

goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. . . .

N.Y. C.P.L.R. § 302(a) (McKinney). Section 302(a) also confers jurisdiction over individual corporate officers who supervise and control an infringing activity. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40, 44 (1988); *accord Retail Software Servs. Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988) (referencing New York law).

■ If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution. This analysis has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. With respect to minimum contacts, we must determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). For purposes of this inquiry, a distinction is made between "specific" jurisdiction and "general" jurisdiction. Specific jurisdiction exists when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts. *Id.* at 414–15 n. 9. Chloé

asserts only specific jurisdiction over Ubaldelli.

■ In determining the strength of the contacts under both section 302(a)(1) and the Due Process Clause, we look to the totality of Defendants' contacts with the forum state. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir.2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the *totality of all defendant's contacts* with the forum state must indicate that the exercise of jurisdiction would be proper." (internal quotation marks omitted)); *Best Van Lines*, 490 F.3d at 242 ("A court deciding whether it has jurisdiction over an out-of-state defendant under the Due Process Clause must evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." (internal quotations marks and citations omitted)).

■ With respect to our analysis of reasonableness as part of the due process inquiry, we ask whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice"—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case. *See Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154. The Supreme Court has held that courts must evaluate the following factors as part of this "reasonableness" analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14, 107 S.Ct.

1026, 94 L.Ed.2d 92 (1987); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 83 (2d Cir.1993) (discussing factors). While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

## II. DISCUSSION

 This case involves an update to our jurisprudence on personal jurisdiction in the age of internet commerce. We hold that on the basis of the facts contained in the record and given the posture of this case on appeal, the single act of an out-of-state defendant employee shipping an item into New York, combined with his employer's extensive business activity involving New York, gives rise to personal jurisdiction over the employee. We arrive at our conclusion by first considering Ubaldelli's single act and Queen Bee's business activity and then imputing that activity to Ubaldelli. We next discuss the application of New York's long-arm statute and conclude with the application of the Constitution's Due Process Clause.

### A. Sale and Shipment of Counterfeit Chloé Handbag into New York

 We begin our analysis with a discussion of the act that was the genesis of this lawsuit: the shipment of the counterfeit Chloé bag. Although Ubaldelli attempts to disavow any connection to that sale and shipment, the record evidence, when viewed in the light most favorable to Chloé, strongly suggests that Ubaldelli was integrally involved in the sale of the handbag to the administrative assistant at Kalow & Springut.

First, Ubaldelli's business office address—the same address and office for which rent was paid out of the joint account for Queen Bee of Beverly Hills—was 170 South Beverly Drive, in Beverly Hills, California. Ubaldelli does not assert, and there is no indication in the record, that this office was used by anyone other than the Defendant–Appellee. Second, the shipping label on the package containing the counterfeit Chloé handbag bore a sender's name of "Queen Bee" and a sender's address of "170 S. Beverly Dr., B.H., CA." Joint Appendix ("J.A.") at 60. Finally, Ubaldelli's deposition testimony is rife with references to his arrangement with Rushing pursuant to which Ubaldelli would coordinate the purchase of the handbags and then ship them out to purchasers across the country.

Based on the evidence in the record and reasonable inferences drawn therefrom, and keeping in mind how we must review the record at this stage of the litigation, we hold that the evidence supports the conclusion that Ubaldelli either physically shipped or was responsible for the shipment of the counterfeit handbag from California to New York.[3]

---

**3.** We recognize that there is some dispute regarding the question of whether a sale of a counterfeit item to a plaintiff's investigator or agent by itself constitutes an act of trademark infringement. *Compare Chloé v. DesignersImports.com USA, Inc.*, No. 07–CV–1791, 2009 WL 1227927, at *10 (S.D.N.Y. April 30, 2009) (citing cases and ruling that "clearly established law and common sense" dictate the conclusion that evidence gathered by investigators posing as consumers are admissible in trademark disputes), *with Mattel v. Anderson*, No. 04 Civ. 5275, 2005 WL 1690528, at *2 (S.D.N.Y. July 18, 2005) (holding that purchase by plaintiff's investigator did not confer specific jurisdiction because the purchase "ha[d] nothing to do with" the trademark infringement claims since the purchaser

## B. *Queen Bee's Contacts with New York*

 Having identified the single act of an out-of-state defendant employee shipping an item into New York, we next review the record as it relates to Queen Bee's contacts with New York. In this regard, we note that both New York's long-arm statute and the Due Process Clause require that Queen Bee's contacts with New York have some connection to Chloé's trademark infringement claim. *See Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868 (noting that specific jurisdiction is proper "[w]hen a controversy is related to or 'arises out of' a defendant's contacts with the forum"); *Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1028 (2d Cir.1997) (same); *Kreutter,* 527 N.Y.S.2d 195, 522 N.E.2d at 43 (requiring "substantial relationship" between single act transaction "and the claim asserted" under N.Y. C.P.L.R. § 302(a)(1)); *McGowan v. Smith,* 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321, 323 (1981) (requiring "some articulable nexus between the business transacted and the cause of action sued upon").

The record, viewed in the light most favorable to Chloé, indicates that Queen Bee had more related contacts with New York than the single act of shipping a counterfeit Chloé bag into the forum. As noted, Queen Bee operated a website which offered Chloé bags for sale to New York consumers, permitted New York consumers to purchase such bags, and facilitated the shipment of those bags into New York from Beverly Hills, where Ubaldelli was located. Further, according to a declaration of Chloé's counsel filed with the district court, Chloé personally supervised the seizure of "three redwelds" of documents located at Queen Bee's offices in Huntsville, Alabama, and Beverly Hills, California. J.A. at 238–39 (Declaration of Milton Springut (January 7, 2008) (hereinafter "Springut Decl.") at ¶¶ 2–3). The documents, the authenticity of which has not been challenged by Ubaldelli,[4] reflect sales by Queen Bee both through its website and through certain "trunk shows." In addition to the documents reflecting sales to "at least 38 states and 16 foreign countries," *id.* at 239 (Springut Decl. at ¶ 3), Chloé's paralegal identified those sales of items into the State of New York, *id.* (Springut Decl. at ¶ 4). The declaration contained an exhibit that summarized fifty-two separate transactions in which merchandise was shipped into New York.[5]

---

"cannot claim to have been confused as to with whom he was dealing"). Indeed, this question is what consumed much of the district court's initial opinion. *Chloé I,* 571 F.Supp.2d at 524–25. We also recognize that our Court has not yet determined how so-called "manufactured contacts" ought to be treated for purposes of trademark infringement claims. Nevertheless, because our holding in the instant case is that an employee's single act of shipping a bag—*any* bag, not necessarily a counterfeit one—into the State of New York, combined with the employer's other business activity involving the State of New York, gives rise to an inference that the defendant "purposefully avail[ed himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174, we leave for another day the question of whether the "single act" of shipping the counterfeit bag to an *agent of the plaintiff, by itself, constitutes an* act of trademark infringement.

4. Springut's Declaration expressly provided Ubaldelli's counsel with the opportunity to review the seized documents if he wished to challenge them. There is no indication that counsel ever availed himself of that offer.

5. Although the exhibit indicates sales from "Queen Bee Alabama," Ubaldelli's deposition testimony strongly suggests that Queen Bee Alabama was merely a denominator for the location occupied by Ubaldelli's partner, Rushing, and was in no way a business entity

*Id.* at 241–42 (Springut Decl. Ex. A). According to the record evidence, therefore, Queen Bee had extensive business contacts with New York customers.

The district court acknowledged that "these contacts indicate Queen Bee's purposeful availment of the New York forum for *some* business activity." *Chloé I,* 571 F.Supp.2d at 524 n. 3 (emphasis in original). It concluded, however, based on some inartful language in Chloé's memorandum of law, that Queen Bee's activity in purposefully creating and serving a market for accessories—including counterfeit Chloé bags—in New York was not sufficiently related to Chloé's trademark infringement claim because the other items sold were branded as, *e.g.,* Gucci, Prada, or Fendi, not as Chloé.

We think the district court's characterization of Defendants' non-Chloé sales as constituting purposeful availment of New York only for "*some* business activity," but not for "the purpose of selling Chloé handbags—the only activity upon which Plaintiffs' complaint is based," *id.,* too narrowly construes the nexus requirement, which merely requires the cause of action to "relate to" defendant's minimum contacts with the forum. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127–28 (2d Cir.2002) (ruling that district court "took too narrow a view of the relevant contacts" where it failed to consider for due process purposes defendant law firm's maintenance of an apartment in New York, faxing of newsletters to New York, and work for New York clients as contacts "related to" plaintiff's legal malpractice claim); *see also Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,* 450 F.3d 100, 104 (2d Cir.2006) (holding that New York long-arm nexus re-

quirement is satisfied unless "the event giving rise to the plaintiff's injury had, at best, a tangential relationship to any contacts the defendant had with New York"). In fact, Queen Bee, through its website, offered Chloé handbags—including. the counterfeit handbag sent to plaintiff's investigator—for sale to New York consumers, itself a possible trademark violation. *See* 15 U.S.C. § 1114(1). It further sold other designer merchandise to New York consumers. Thus, these additional contacts show that the shipment of a counterfeit Chloé bag was not, as the district court thought, a "one-off transaction," *Chloé II,* 630 F.Supp.2d at 354, but rather a part of a larger business plan purposefully directed at New York consumers.

Accordingly, we conclude that the relevant minimum contacts between Queen Bee and New York include the more than fifty sales of designer handbags into New York and are not limited to the narrow subset of one sale that involved a Chloé handbag shipped to Plaintiffs–Appellants' New York law firm.

### C. *Ubaldelli's Connection to Queen Bee*

■ Although Chloé alleges that Ubaldelli was "a conscious dominant and active force behind the wrongful acts of Queen Bee complained of herein, which wrongful acts has engaged in [*sic* ] for the benefit of Queen Bee and for his own individual gain and benefit," J.A. at 124 (Amended Complaint (Nov. 3, 2006) at ¶ 7), Ubaldelli argues that those acts may not be imputed to him. We disagree with Ubaldelli.

In *Kreutter v. McFadden Oil Corp.,* the New York Court of Appeals ruled that in order to establish jurisdiction in a similar context, the plaintiff did not need to estab-

---

distinct from Queen Bee, which the record demonstrates had some form of operations in

both California and Alabama.

lish a formal agency relationship between the individual defendant living in Texas and the defendant New York company through which the individual defendant solicited investments. Rather, the plaintiff only needed to convince the court that the party over whom he was seeking to assert jurisdiction "engaged in purposeful activities in this State … and that [the employer] exercised some control over [defendant] in the matter." *Kreutter*, 527 N.Y.S.2d 195, 522 N.E.2d at 44. In the instant case, Ubaldelli's deposition testimony unmistakably demonstrates that there existed a *Kreutter*-type relationship between Ubaldelli and Queen Bee. During a deposition, dated June 20, 2006, Ubaldelli testified as follows:

Q: And when [Rushing] bought a bag did you make any money?

A: Well, when she buy *[sic]* a bag and sell it, yes.

Q: How did that work?

A: We split it. You know, we have this bank account together and so we use it to buy and then, you know, we get the money and we take whatever we can. We never get a salary. We never really got an arrangement on that because we kind of continuously we buy and never really make that much money. We try to survive buying and selling, but because the Euro, because the competition and everything, we never—we could never pay us like regularly this is a salary. We take some money when we think we can, if we can, and if we have to pay the rent or other stuff.

. . .

Q: When you wanted to take money out did you have to talk to her? How was that arranged?

A: Well, yes, we have to decide, you know, when the money goes out and especially Rebecca, she's easy to spend money. And you have to keep an eye on we need to pay rent and then she goes and buy *[sic]* and we don't have any money in the bank. So I have to—we have to discuss, yes, when we pay.

Q: When you say pay rent, pay rent for what?

A: Pay rent for my office.

Q: On Beverly?

A: Yes.

Q: So that came out of this joint account you had?

A: Yes.

Q: What was the name of the joint account?

A: It's Queen Bee of Beverly Hills

. . . .

Q: When it came to buying, both of you made the decision?

A: Yes, we have to decide what to buy.

Q: And how did that work? . . .

A: I said, "I find something, this is the price, and do you want—do you think we can sell it?" . . .

Q: When she found some items how did it work?

A: The same thing. She said, "I find this or I can sell it for this" and I said okay.

Q: And who had the authority to sign checks for Queen Bee? Both of you?

A: Both of us.

. . .

Q: Okay. Generally when you got these bags from Guido you would ship them to Rebecca in Alabama, right?

A: Yeah, sometimes she said, "I sold one on the internet. Do you want to ship it to this client?" If I have it there I ship it there. Usually I

take it and ship and she does everything.

As is clear from his testimony, Ubaldelli shared in the profits from the bags Queen Bee sold, had joint access to the Queen Bee bank account, used Queen Bee revenue to pay his Beverly Hills rent, and shared in the decision-making and execution of the purchase and sale of handbags.

Viewing the facts in the light most favorable to Chloé, as we must at this stage—particularly in light of the fact that Ubaldelli neither raised the issue in his motion to dismiss nor appealed from that part of the district court's decision attributing Queen Bee's contacts to him—we hold that Queen Bee's activities in the State of New York may be imputed to Ubaldelli in the course of analyzing whether the court may exercise personal jurisdiction over Ubaldelli.

### D. *New York's Long-arm Statute*

■ Having established Ubaldelli's single act of shipping an item into New York and his employer's extensive business activity involving New York—activity which may be imputed to Ubaldelli—we next turn to the law of personal jurisdiction.

As laid out above, in order for a federal court sitting in New York to assert jurisdiction over Ubaldelli, a California resident, Chloé must satisfy the requirements of both New York's long-arm statute and the Due Process Clause of the United States Constitution. On appeal, Chloé asserts that jurisdiction over Ubaldelli was proper under N.Y. C.P.L.R. § 302(a)(1) and (a)(3) because Ubaldelli transacted business within the state and committed a tortious act causing injury in the state. Because we conclude that Ubaldelli trans-

acted business within the state under section 302(a)(1), we need not reach the question of whether a New York court could properly exercise jurisdiction under section 302(a)(3).[6]

■ Section 302(a)(1) states that "a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state." As we observed in *Best Van Lines*, "New York decisions ..., at least in their rhetoric, tend to conflate the long-arm statutory and constitutional analyses by focusing on the constitutional standard: whether the defendant's conduct constitutes 'purposeful availment.' " *Best Van Lines*, 490 F.3d at 247 (brackets omitted). Thus, a defendant need not be physically present in New York to transact business there within the meaning of the first clause of section 302(a)(1), *see Deutsche Bank Secs., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 818 N.Y.S.2d 164, 850 N.E.2d 1140, 1142–43 (2006) (noting that growth of national markets and technological advances "enable a party to transact enormous volumes of business within a state without physically entering it"); *Parke–Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506, 508–09 (1970) (same), as long as he engages in "[p]urposeful activities" or "volitional acts" through which he "avails [him]self of the privilege of conducting activities within the ... State, thus invoking the benefits and protections of its laws," *Fischbarg v. Doucet*, 9 N.Y.3d 375, 849 N.Y.S.2d 501, 880 N.E.2d 22, 26 (2007) (internal quotation marks omitted). Further, the second clause of section 302(a)(1)

---

6. We note further that addressing the application of section 302(a)(3) would be inappropriate in light of this Court's recent certification of a question regarding the proper interpretation of section 302(a)(3) to the New York State Court of Appeals. *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30 (2d Cir.2010).

provides for jurisdiction where the defendant has only "minimal contacts" with New York but contracts to deliver goods or services to the state. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 789 (2d Cir.1999); *see also Island Wholesale Wood Supplies, Inc. v. Blanchard Indus., Inc.* 101 A.D.2d 878, 476 N.Y.S.2d 192, 194 (N.Y.App.Div.1984) ("[T]he amendment deems the shipment of goods into the State or the performance of services in the State to be an act by which a nondomiciliary avails itself of the privilege of conducting activities in the State.").

Accordingly, courts have explained that section 302 "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter,* 527 N.Y.S.2d 195, 522 N.E.2d at 43; *see also Grand River,* 425 F.3d at 166. Applying this standard, district courts in this circuit have concluded that the "single act" of selling counterfeit goods into New York satisfies the long-arm statute under section 302(a)(1). In *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.,* 923 F.Supp. 433 (S.D.N.Y.1996), the district court ruled that since the defendants admitted shipping goods into New York that allegedly infringed a trademark, the "shipments were purposeful and substantially related to plaintiffs' claim of trademark infringement," and section 302(a)(1) was therefore satisfied. *Id.* at 436. In *Mattel, Inc. v. Adventure Apparel,* No. 00 CIV 4085, 2001 WL 286728 (S.D.N.Y. Mar. 22, 2001), a trademark in-

fringement case, the district court ruled that when an investigator for Mattel (located in New York) ordered an item from defendant Adventure Apparel's website (an Arizona company with its website hosted by a separate California company),

> [t]his activity not only involved the exchange of payment and shipping information but, moreover, was a commercial transaction that was actually consummated on line. These activities were sufficient to bring Adventure into the category of a defendant "transact[ing] any business," via the internet, in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1).

*Id.* at *3 (second alteration in original).[7]

Under this reasoning, Ubaldelli's single act of shipping a counterfeit Chloé bag might well be sufficient, by itself, to subject him to the jurisdiction of a New York court under section 302(a)(1). We need not, however, decide that question because, in this case, Queen Bee also operated a highly interactive website offering such bags for sale to New York consumers, *see Best Van Lines,* 490 F.3d at 252 (holding that website's interactivity "may be useful" for analyzing personal jurisdiction "insofar as it helps to decide whether the defendant 'transacts any business' in New York"); *Vandermark v. Jotomo Corp.,* 42 A.D.3d 931, 839 N.Y.S.2d 670, 671 (N.Y.App.Div. 2007) (holding that website may confer personal jurisdiction where it "has significant commercial elements, which typically are found to constitute the transaction of business"), and engaged in fifty-two other transactions where merchandise was shipped to New York. Viewed in their totality, these contacts sufficiently demon-

---

7. The factual record in the instant case is not clear as to whether the order was actually consummated online or whether the exchange of credit card information was done over the phone. For our purposes, however, this is a distinction without a difference because the relevant facts are that the order was placed online, via Queen Bee's website, and the item was shipped into New York.

strate Ubaldelli's purposeful availment of the benefits of transacting business in New York.

Ubaldelli argues that section 302(a)(1) is better suited for contract cases and cites case law requiring that there be an ongoing contractual relationship in order to invoke section 302(a)(1). We have held to the contrary. In *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757 (2d Cir.1983), this Court stated that "[s]ection 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff *or commits a commercial tort* against plaintiff in the course of transacting business or contracting to supply goods or services in New York." *Id.* at 764 (emphasis added) (citations omitted). Trademark infringement is just such a tort. *See, e.g., Sunward Elecs.*, 362 F.3d at 23–24. Accordingly, jurisdiction under section 302(a)(1) is proper because Defendants transacted business within the State of New York.

**E. *The Due Process Clause***

There are two components to the due process analysis undertaken to determine whether Ubaldelli is subject to the court's jurisdiction for commercial activity involving the State of New York: (1) the minimum contacts inquiry and (2) the reasonableness inquiry. *See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 37–38 (2d Cir.2001).

*1. Minimum contacts*

We conclude that assertion of personal jurisdiction over Ubaldelli comports with due process for the same reasons that it satisfies New York's long-arm statute. Namely, by offering bags for sale to New York consumers on the Queen Bee website and by selling bags—including at least one counterfeit Chloé bag—to New York con-

sumers, Ubaldelli has "purposefully avail[ed][him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (internal quotation marks omitted). In other words, jurisdiction is appropriate in New York because Queen Bee has developed and served a market for its products there. *See, e.g., World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In actually sending items to New York, there can be no doubt that Ubaldelli's conduct was *"purposefully directed toward the forum State."* *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026 (emphasis in original). As Chloé correctly asserts, that Queen Bee's business attempted to serve a nationwide market does not diminish any purposeful contacts with Queen Bee's New York consumers. *See Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 243 (2d Cir.1999) (upholding personal jurisdiction where " 'exclusive sales rights' agreement, which contemplates that Kurz–Hastings will sell Navitas's machines in North America and throughout the world, serves as evidence of Navitas's attempt to serve the New York market, albeit indirectly").

Relying on *Travelers Health Association v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950), *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and *Burger King*, the district court concluded that Chloé could not demonstrate the requisite purposeful availment because Ubaldelli did not develop a continuing relationship with any particular New York consumer. *Chloé II*, 630 F.Supp.2d at 354. Summarizing the various ways a defendant might have "purposefully directed" his conduct at residents of the forum state, the Supreme Court has noted that "parties who reach out beyond one state and create

172

continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King,* 471 U.S. at 472–73, 105 S.Ct. 2174 (internal quotation marks omitted). But, while it may be sufficient to provide a basis for asserting jurisdiction, a continuing relationship is not necessary for conduct to be purposefully directed at the forum. Rather, as the Supreme Court observed, a court could assert jurisdiction over a corporation that, like Queen Bee, "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State and those products subsequently injure forum consumers." *Id.* at 473, 105 S.Ct. 2174 (internal quotation marks omitted) (quoting *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559).[8] And, similarly, "a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story." *Id.* (citing *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). This case is more akin to these latter circumstances where personal jurisdiction has been upheld even in the absence of a continuing relationship. Unlike *McGee,* for example, where the record indicated that "respondent has never solicited or done any insurance business in California apart from the policy involved," *McGee,* 355 U.S. at 222, 78 S.Ct. 199, Queen Bee has

shipped numerous items into New York. It therefore does not offend due process to require Ubaldelli to answer in New York for the consumer confusion allegedly caused there through his purposeful direction of bags into the state.

Chloé also submits that jurisdiction is proper under *Calder v. Jones,* because trademark infringement is a tort and its effects are felt in New York where Chloé is located and consumers might be deceived. Because we have concluded that Ubaldelli has purposefully availed himself of the benefits of the New York forum, we need not decide whether Ubaldelli's act of shipping a counterfeit Chloé bag represented conduct "expressly aimed at" New York under the *Calder* effects test. *Calder,* 465 U.S. at 789, 104 S.Ct. 1482; *see also Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship,* 34 F.3d 410, 411–12 (7th Cir.1994) (holding that infringement of Colts trademark was expressly aimed at Indiana where trademark holder and bulk of confused fans were located); *Licciardello v. Lovelady,* 544 F.3d 1280, 1288 (11th Cir.2008) (holding *Calder* satisfied in similar circumstances because trademark infringement is commercial tort expressly aimed at forum where trademark owner is located).

Accordingly, we conclude that Ubaldelli has sufficient contacts with New York to satisfy the "minimum contacts" inquiry of the Due Process Clause.

2. *Reasonableness*

Even where an out-of-state defendant purposefully avails himself of the

8. While jurisdiction based on purposeful availment through placing goods into the stream of commerce ordinarily applies in the context of consumer injuries, we see no reason it should not also apply where the forum state injury is to a trademark holder (as opposed to a consumer). *See, e.g., McFadin v. Gerber,* 587 F.3d 753, 762 (5th Cir.2009) (discussing the Fifth Circuit's "appl[ication of]

the Supreme Court's 'stream of commerce' doctrine to trademark infringement claims"). We also note that applying the stream of commerce doctrine to a trademark infringement claim does not require us to resolve certain questions about application of that doctrine which we left open in *Kernan,* 175 F.3d at 244, and decline to address here.

forum state, plaintiffs must still demonstrate that the exercise of jurisdiction does not "offend traditional notions of fair play and substantial justice" and is thus reasonable under the Due Process Clause. *Asahi,* 480 U.S. at 113, 107 S.Ct. 1026 (internal quotation marks omitted). The Supreme Court has set forth five factors that must be considered when determining the reasonableness of a particular exercise of jurisdiction:

> A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.

*Id.; see also Metro. Life,* 84 F.3d 560, 568. The district court analyzed these factors in a footnote in *Chloé II* and concluded that the five factors favored Ubaldelli. *Chloé II,* 630 F.Supp.2d at 354 n. 2. We disagree.

With regard to the first factor, we acknowledge that there will be some burden on Ubaldelli if he must travel to New York for trial. The inconvenience, however, cuts both ways since all of Chloé's witnesses would have to travel to California if the case were brought there. *Cf. Bank Brussels,* 305 F.3d at 129–30 ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." (internal quotation marks omitted)). The second factor favors New York as the forum state since a state frequently has a "manifest interest in providing effective means of redress for its residents." *Burger King,* 471 U.S. at 483, 105 S.Ct. 2174 (internal quotation marks omitted). The third factor necessarily favors Chloé since Chloé N.A.'s headquarters are in New York and some of its witnesses are located there. The final two factors are neutral.

In light of our holding that Chloé "has made a threshold showing of minimum contacts at the first stage of the inquiry," *Metro. Life,* 84 F.3d at 568, Ubaldelli's generalized complaints of inconvenience arising from having to defend himself from suit in New York do not add up to " 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' " *id.* (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174). Consequently, we hold that asserting jurisdiction over Ubaldelli comports with "traditional notions of fair play and substantial justice," *see Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154, such that it satisfies the reasonableness inquiry of the Due Process Clause.

### III. CONCLUSION

We hold that on the basis of the record before us at this stage of the litigation, Chloé has satisfied its burden to show that this Court has personal jurisdiction over Ubaldelli based on the totality of his contacts with the forum state of New York. We hold that those contacts permit the exercise of personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1), and satisfy both the minimum contacts test and the reasonableness test of the Due Process Clause. Accordingly, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.