**Christopher Carter SANDERSON,**
**Plaintiff,**

**v.**

**HORSE CAVE THEATRE 76,**
**d/b/a Kentucky Repertory**
**Theatre, Defendant.**

**No. 12 Civ. 708 (KNF).**

United States District Court,
S.D. New York.

July 26, 2012.

Allie Nicole Diamond, John Douglas Rue, Joshua Seth Levy, Sarah Hancock Melikian, White & Case LLP, New York, NY, for Plaintiff.

Wendy J. Mellk, Jackson Lewis LLP, Melville, NY, C. Mike Moulton, Moulton & Long PPLC, Elizabethtown, KY, Joanna Suzan Smith, Jackson Lewis LLP, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

KEVIN NATHANIEL FOX, United States Magistrate Judge.

### INTRODUCTION

Christopher Carter Sanderson ("Sanderson") commenced this action against Horse Cave Theatre, d/b/a Kentucky Repertory Theatre ("KRT"), seeking damages for breach of an employment contract. The parties consented to proceed before a magistrate judge for all purposes, pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. Before the Court is KRT's "Motion to Dismiss for Improper Venue and Lack of Personal and Subject Matter Jurisdiction," made pursuant to Rule 12 of the Federal Rules of Civil Procedure. Sanderson opposes the motion.[1]

1. The plaintiff's letter, dated May 24, 2012, sent to the Court without authorization after the defendant's motion was fully briefed, and the defendant's letter, dated May 26, 2012, sent to the Court in response to the plaintiff's

## BACKGROUND

*Allegations in the Complaint*

Sanderson alleged the following in his complaint:

Since January 1, 2011, he has been "a citizen of New York and resides" in Brooklyn, New York. KRT "is a nonprofit corporation, incorporated under the law[s] of Kentucky," with its principal place of business in Horse Cave, Kentucky. Sanderson is a director, producer, playwright and composer, who, over the past 18 years, had 16 plays reviewed by the New York Times. In 2011, Sanderson was awarded a theatrical development Fulbright Grant. On or about January 1, 2011, KRT advertised the position executive director, in ArtSearch, a publication that advertises positions available in the arts, and ArtsOpportunities, a Web site that posts theater-related jobs, both of which are published by the Theatre Communications Group, located in New York. Sanderson applied for the position.

On or about February 5, 2011, KRT contacted Sanderson to express interest in interviewing him for the executive director position. Shortly thereafter, KRT conducted a telephonic interview and a follow-up Skype interview with Sanderson, and it brought him to Kentucky for an in-person interview. At the time of the interviews, Sanderson was in Norway, performing duties in connection with his Fulbright Grant. During the interviews, KRT expressed interest in Sanderson's strong reputation and network of contacts in the New York theatrical community. Sanderson inquired, at a KRT board meeting, how KRT defined success for an executive director and was told that it is defined, in large part, as "transferring shows between KRT and New York." KRT told Sanderson that it would expect him to use his New York contacts with the press, directors, actors and theater network to assist KRT

in producing and transferring shows to and from New York.

From February 15 to 25, 2011, "while Sanderson was in New York, KRT and Sanderson continued discussions and contract negotiations concerning the position of Executive Director via telephone and email." Subsequently, KRT sent Sanderson, electronically, a nonbinding Memorandum of Understanding ("MOU") which included the material terms of their employment agreement. On February 25, 2011, Sanderson signed the MOU in New York and transmitted a copy of it to KRT. Sanderson ended the work he was performing under his Fulbright Grant prematurely, and arrived in Kentucky on March 5, 2011. On March 7, 2011, Sanderson and KRT signed an employment agreement.

Sanderson was employed by KRT from March 1 to December 6, 2011. When he assumed his duties, Sanderson engaged Dash Media/PR, a New York City public relations agency specializing in the New York theater, to represent KRT. Dash Media/PR obtained publicity for KRT in Kentucky and New York City. During his employment with KRT, Sanderson, on behalf of KRT, "contacted, networked and otherwise leveraged his New York connections in the following ways," he: (a) reached out to the acting community in New York by contacting numerous actors and recruited many New York actors on behalf of KRT, including members of the No. 11 Production Theater Company and Brett Hunter Levenson, an actor with Broadway credits, to act in a KRT production in Kentucky; (b) contacted various individuals in New York City to recruit directors, including the Artistic Director of the New York Shakespeare Festival, the Associate Director of the New York Theater Workshop, the Artistic Director of

unauthorized letter, have not been considered    by the Court in resolving the motion.

the Metropolitan Playhouse and others; (c) contacted various New York producers to recruit them to finance KRT productions and co-produce shows that would move between Kentucky and New York; (d) contacted New York academics to obtain student interns for KRT; (e) contacted trade organizations in New York to involve them in KRT shows in Kentucky and New York; (f) contacted New York theaters to enlist them as co-producers to facilitate the movement of KRT shows from Kentucky to New York and vice versa; (g) contacted Wingspace Theatrical Design to acquire design and technical personnel for KRT shows in New York and Kentucky; (h) used his New York connections to obtain publicity for KRT through such press vehicles as The New York Times, The Clyde Fitch Report, Backstage, The Village Voice and Time Out NY; and (i) contacted the New York City Department of Parks and Recreation and the Office of the Mayor of New York City to obtain permission to perform KRT shows in the city's parks.

Prior to and during his employment with KRT, KRT encouraged Sanderson to maintain his connection with the Gorilla Repertory Theater, which Sanderson founded in 1992, to stage free productions of classical plays in public spaces in New York City. While serving as KRT's executive director, Sanderson brought new and original programming to the theater and "brought shows from New York to KRT and from KRT to New York." From about May 23 to 30, 2011, and from October 1 to 5, 2011, Sanderson conducted business in New York on behalf of KRT.

On or about October 6, 2011, at a KRT board meeting, "Sanderson emphasized KRT's financial situation and offered to take a temporary voluntary furlough and to defer $2,000 in back pay then owed to him so that KRT could put on the Christmas special and follow-through on KRT's co-production obligations with Gorilla Rep. KRT accepted this offer." On December 6, 2011, KRT gave Sanderson notice that his employment was terminated, "for cause," stating, *inter alia:*

> A decision was made by the Board of Directors on October 17, 2011 to lay you off from your position as Executive Director of the Theatre after a report from you that KRT was financially unable to pay your salary. Prior to October 17, 2011 and after October 17, 2011 you have harmed the goodwill of the theatre and the reputation of the theatre through public contact with patrons and supporters, facebook postings, and email exchanges. You continuously and deliberately attempt to show dissent among the public in an effort to promote your personal interests to the detriment of KRT. Your actions are unacceptable and constitute cause for dismissal. Be advised that slanderous or libelous remarks in any medium including Internet postings, or emails are considered by KRT as actionable and subject you to legal action.

On or about December 15, 2011, KRT informed the press that it had terminated Sanderson's employment.

### Defendant's Contentions

KRT contends that venue does not lie with this court because "[t]he contract which is the issue in this case is an employment contract to be performed in the Commonwealth of Kentucky." According to KRT, "Kentucky is the only venue in which a substantial part of the events, in fact all of the events, giving rise to the claim of breach occurred," namely: (a) Sanderson's allegation that "at a KRT board meeting, on or about October 6, 2011, Sanderson voluntarily took a furlough from his Executive Director position due to financial conditions of KRT"; (b) KRT's "position that he was laid off by the

board on October 17, 2011 as a result of a report from Sanderson that KRT was not financially able to pay his salary," as demonstrated by the termination letter dated December 6, 2011; and (c) Sanderson's application for unemployment benefits on October 8, 2011 in Kentucky. KRT contends that "a primary function of [Sanderson's] job [was] to get acts to come to KRT in Kentucky to entertain KRT's patrons," which is why Sanderson "sought performers in New York"; however, the "termination of Sanderson has absolutely no relation to activities in any state other than Kentucky." KRT maintains that the termination letter indicates that "the substantial part of the events or omissions giving rise to his claim of breach of contract, were [sic] a result of actions he took in Kentucky and had nothing to do with his activities in New York or other states," so "venue is proper only in Kentucky." KRT contends that "the contacts Sanderson had with New York, and other states, were ancillary to the performance of his duties and [sic] Executive Director," because his "primary responsibility was the day to day management of KRT in Horse Cave, Kentucky."

KRT also contends that the "litany of facts Sanderson cites as support for his personal jurisdiction argument are [sic] insufficient to subject KRT to this court's personal jurisdiction" because the breach of contract occurred in Kentucky and "Sanderson's contacts in New York on behalf of KRT are irrelevant to this action of breach of an employment contract by termination." Moreover, Sanderson does not satisfy the amount of damages required for subject matter jurisdiction because the amount of damages alleged in the complaint is "in contradiction to the plain language of the Employment Contract," which "limits the amount of money Sanderson could receive after notification of the employment agreement to wages and benefits for only a six month period," namely "$32,640.00." According to KRT,

> Sanderson also prays for damages for reputational harm, for leaving his Fulbright Grant early, for being publicly fired by KRT and for loss of the benefit of his contractual right to search for new employment while currently employed as Executive Director of KRT, those damages are purely speculative at best and do not carry any dollar figures in Sanderson's prayer for relief.

KRT maintains that "Sanderson has not established, or asserted in his complaint, that such damages are allowed for a breach of employment contract claim under Kentucky law, which KRT asserts they are not."

In support of its motion, KRT submitted Exhibit 2, an affidavit by Lyn Taylor Long ("Long"), president of KRT's board of directors, who stated that she was a member of the board of directors at the time of the events at issue in this action. Long explained that KRT is a regional theater whose primary business is "the production of theatrical performances presented to the general public," except that "[w]hile on rare occasions KRT may present plays in other than its facility at Horse Cave, those venues have always been in Kentucky and in the region of Horse Cave, Hart County, Kentucky." Long stated that at the end of 2010, KRT began its search for a new executive director and advertised the position "in numerous professional publications including but not limited to Art Search and Arts Opportunities." According to Long, in January 2011, "Sanderson emailed Judge [Kelly Mark] Easton[, then president of KRT's board of directors,] and expressed his desire to be considered for the Executive Director position." Subsequently, Long exchanged e-mail communications with Sanderson and, in February 2011, an interview was scheduled for Sand-

erson, via Skype, all while he was in Norway. KRT purchased an airline ticket for Sanderson to fly from Norway to Kentucky for his interview. According to Long, "[a]ll negotiations regarding the employment of Sanderson were conducted in Kentucky, no representative of KRT ever left Kentucky to negotiate with Sanderson; he always came to Kentucky." Sanderson was offered the executive director's position and a contract was executed by him in Kentucky, on March 7, 2011. Long stated that "[o]n or about October 17, 2011, Sanderson was laid off due to his asserting that KRT did not have enough funds to pay his salary," and "[o]n or about December 6, 2011, a decision was made by the KRT Board, in a board meeting conducted in Horse Cave, Kentucky, to terminate Sanderson's employment with KRT for the reasons stated in the letter addressed to Sanderson." In her affidavit, Long refers to Exhibit 4, consisting of e-mail communications between Long and Sanderson concerning Sanderson's application for the executive director's position with KRT.

Attached to KRT's memorandum of law are also the following: (1) "Exhibit 1, Kentucky Secretary of State web site general information"; (2) Exhibit 3 [2], what appear to be "Christopher Carter Sanderson–LinkedIn" web pages indicating his education and experience; (3) Exhibit 5, what appears to be the March 7, 2011 "Employment Agreement" between Sanderson and KRT, and a three-page document entitled "Managing Director Horse Cave Theatre, Inc. d/b/a Kentucky Repertory Theatre"; (4) Exhibit 6, what appears to be a voter registration record inquiry concerning Sanderson from Hart County, Kentucky; (5) Exhibit 7, what appears to be a copy of "an official letter from the Princeton Boro

Municipal Court in Princeton, New Jersey ... delivered to [Sanderson's] Horse Cave address, [and] addressed to Sanderson"; (6) Exhibit 8, what appears to be a Commonwealth of Kentucky, Division of Unemployment Insurance Employer Notification concerning Sanderson and KRT; (7) Exhibit 9, what appear to be Sanderson's "web page postings"; (8) Exhibit 10, what appears to be the December 6, 2011 termination letter from KRT's board of directors to Sanderson; and (9) Exhibit 11, what appears to be a Commonwealth of Kentucky, Transportation Cabinet, Division of Driver Licensing Driving History Record for Sanderson. Long stated in her affidavit: "I have reviewed all documents attached to KRT's memorandum and assert that they are true and accurate copies of documents retained and kept in the ordinary course of business by KRT and/or the KRT Board of Directors."

However, in her affidavit, Long failed to identify "all documents attached to KRT's memorandum" or explain what each document is and for what purpose each is being offered. The only exhibit attached to KRT's memorandum of law to which Long refers in her affidavit is Exhibit 4, "an email exchange" with Sanderson, in January 2011. Although Long stated that "all documents attached to KRT's memorandum" are "kept in the ordinary course of business," that statement, without more, does not satisfy Rule 803 of the Federal Rules of Evidence. That is so because to qualify as an exception to the rule against hearsay under Rule 803(6), the custodian of the record(s) or other qualified witness needs to show not only that the record(s) is "kept in the course of a regularly conducted activity of a business," but also that: (i) "the record was made at or near

---

**2.** KRT contends, on page 1 of its memorandum of law, that Exhibit 3 is an "Affidavit of Sandra Wilson," while it also contends, on page 2 of its memorandum of law, that Exhibit it 3 is "a resume of [Sanderson's] qualifications." No "Affidavit of Sandra Wilson" was submitted by KRT with its motion papers.

the time [of an act, event, condition, opinion, or diagnosis] by—or from information transmitted by—someone with knowledge," and (ii) "making the record was a regular practice of that activity." Fed. R.Evid. 803(6). Additionally, it must be clear that "neither the source of information nor the method or circumstances of preparation indicate [that the record lacks] trustworthiness." Fed.R.Evid. 803(6)(E).

Here, in addition to not identifying any exhibit attached to the defendant's memorandum of law, Long failed to show that the unidentified records to which she refers in her affidavit were made at or near the time of an act, event, condition or opinion, or from information transmitted by someone with knowledge and that making the records was a regular practice of KRT's regularly conducted activity. For example, Exhibit 9 attached to the defendant's memorandum of law purports to be Sanderson's "web page posting, [showing that] Sanderson no longer lives in New York." Exhibit 9 appears to be a document printed from the Web on March 25, 2012, more than one year after Sanderson's employment was terminated by the defendant and more than two months after this action commenced. Long did not show that Exhibit 9 was made by or from information transmitted by someone with knowledge of Sanderson's personal Web page or that making the record, *i.e.* printing and retaining data from the personal Web page of a former employee more than one year after he was terminated for cause, was a regular practice of KRT's regularly conducted activity, as required by Rule 803(6). The circumstances of the preparation of Exhibit 9 suggest that it is a document that was prepared solely for the purpose of this litigation and the method of preparation suggests the document lacks trustworthiness, because Long did not show that she has any knowledge respecting whether Exhibit 9 is what it purports to be or who prepared Exhibit 9, how it was prepared

or why it was prepared. Other exhibits attached to the defendant's memorandum, except Exhibit 4, similarly, do not satisfy the Rule 803(6) exception to the rule against hearsay.

Moreover, apart from Exhibit 4, which is authenticated by Long's affidavit, no affidavit or declaration was submitted with any other exhibit attached to KRT's memorandum of law authenticating it, as required by Local Civil Court Rule 7.1 and the Federal Rules of Evidence. Even assuming that, apart from Exhibit 4, other exhibits attached to KRT's memorandum of law have been authenticated, they are irrelevant to the instant motion because no dispute exists or challenge is made to: (i) KRT's business address and location; (ii) Sanderson's education and experience; (iii) the text of the March 7, 2011 employment agreement between Sanderson and KRT; and (iv) Sanderson's receiving unemployment insurance from Kentucky. Similarly, KRT does not dispute that this action is between citizens of different states, making Exhibit 6 and Exhibit 11 irrelevant. Accordingly, Exhibit 4, "an email exchange" between Sanderson and Long in January 2011, authenticated by Long, and Exhibit 10, the December 6, 2011 letter of termination, attached as an exhibit to the complaint, will be considered as evidence in support of KRT's motion.

### Plaintiff's Contentions

Sanderson contends that the Court has subject matter jurisdiction over this action based on complete diversity of citizenship, and he "seeks expectation damages of $256, 701.30," because his employment contract was a five-year contract and he was discharged wrongfully prior to its termination. Sanderson also seeks "damages for reputational harm and attorney's fees." According to Sanderson, although KRT's argument that the employment agreement "limits Sanderson's remedy to six months's

salary ... may be appropriate in the merits or damages phase, [KRT] does not effectively dispute that Sanderson met the amount in controversy requirements in good faith." Moreover, KRT's argument does "not even approach proof to a 'legal certainty' that Sanderson cannot recover $256,701.30 in expectation damages, plus other damages to be determined by the Court."

Sanderson maintains that, "absent a forum selection clause, this Court must apply New York law (limited, if relevant, by the boundaries of constitutional due process) to determine whether personal jurisdiction is proper." He alleges that the Court has specific jurisdiction over KRT because "KRT's solicitation of Sanderson's services in New York constituted a purposeful availment 'of the privileges of conducting activities within the forum State,'" and "KRT hired Sanderson as Executive Director so that he would use his New York connections to obtain press, transfer shows between KRT and New York, and bring other New York theater personnel to KRT." Moreover, Sanderson contends, the court has long-arm jurisdiction over KRT because "KRT purposefully availed itself of the benefits of doing business in the forum when it engaged Sanderson to act in New York on KRT's behalf pursuant to the 5–Year Contract." Sanderson maintains that he fulfilled a primary function of his contract with KRT when he "traveled to New York (the center of the theater industry in the United States) to recruit personnel for KRT," and all of his "many transactions with New York during his tenure at KRT ... were done with the approval of and on behalf of KRT to fulfill his duties under the 5–Year Contract." Moreover, Sanderson contends, "KRT also transacted business in New York when it discussed and negotiated the 5–Year Contract with Sanderson via telephone and e-mail while he was in New York," and "KRT also sent a Memorandum of Under-standing to Sanderson in New York, which he then signed (also in New York) and sent back to Kentucky."

Sanderson contends that venue is proper in this court because "parts of the 5–Year Contract were negotiated and executed in New York," and he "was to perform the 5–Year Contract in both Kentucky and New York." Moreover, "the breach occurred in New York at least in part because KRT sent its December 6, 2011 termination letter to New York," and "the harm of the breach occurred in New York because Sanderson accepted the position with KRT in part in order to secure subsequent employment in New York theater." According to Sanderson, transferring this action to a different venue would be improper, because he would "be unable to bear the expense related to prosecuting this action in Horse Cave, Kentucky," given that his "only source[s] of income are unemployment benefits and food stamps."

In support of his opposition to KRT's motion, Sanderson submitted his affidavit, made in the State of New York, County of New York, and notarized by Jeffrey Curtis, Notary Public for the Commonwealth of Virginia. However, a notary public must be appointed and commissioned in New York in order to notarize an affidavit within New York. *See* New York Executive Law §§ 130–138. Since Sanderson's affidavit, made in New York, was not notarized by a notary public commissioned in New York, it cannot be considered as evidence by the Court.

### Defendant's Reply

KRT contends that "[t]he term of the contract was five years but that term was subject to the other provisions of the contract, including the termination with six month notice clause," and six months of pay is, "at most," what Sanderson could recover if he prevails in this action, given that the letter announcing his termination

stated the termination was for cause. Moreover, according to KRT, Sanderson's claim for damages based on his terminating his work under the Fulbright Grant early, has no merit because "[h]e was actively looking to leave his position under the grant early when KRT came along," as demonstrated by his own e-mail message to Long. In addition, Sanderson's employment was terminated in Kentucky and, if any reputation damages were suffered as a result of his termination, they "would be in Kentucky not New York." KRT asserts that "[e]verything giving rise to Plaintiff's claim of breach of the employment contract by termination occurred solely in Kentucky and involved only contacts with Kentucky," and Sanderson's duties and responsibilities were to be performed in Kentucky, not New York." Additionally, KRT contends, "[a]ny cost to Sanderson to prosecute the case in Kentucky, a state from whom he is still receiving financial unemployment benefits, is heavily outweighed by the cost to KRT to defend in New York."

## DISCUSSION

### Rule 12(b)(1) Lack of Subject Matter Jurisdiction

#### Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the non-conclusory factual allegations in the complaint, unless contradicted by evidence, are taken as true and all reasonable inferences drawn from those factual allegations are construed in favor of the plaintiff. *See Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir.2011). "On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zap-*

*pia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir.2000).

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States." 28 U.S.C. § 1332(a)(1). KRT does not dispute that this action is between citizens of different states, but contests the amount in controversy.

In this circuit "a rebuttable presumption [exists] that the face of the complaint is a good faith representation of the actual amount in controversy." *Wolde–Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir.1999). "To overcome the face-of-the-complaint presumption, the party opposing jurisdiction must show 'to a legal certainty' that the amount recoverable does not meet the jurisdictional threshold." *Scherer v. Equitable Life Assurance Soc'y of the U.S.*, 347 F.3d 394, 397 (2d Cir.2003) (citation omitted). "Legal certainty is analyzed by what appears on the face of the complaint," and subsequent events, including an actual recovery below the minimum jurisdictional amount, are irrelevant. *Wolde–Meskel*, 166 F.3d at 63. "[E]ven where [the plaintiff's] allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted." *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982).

#### Application of Legal Standard

No bad faith is asserted against Sanderson by KRT. Sanderson alleges that, on or about March 7, 2011, he entered into a five-year employment contract with KRT, which provided for his termination upon either six-months prior written notice or for cause. Sanderson asserts

that on or about December 6, 2011, KRT provided him written notice that his employment was terminated for cause, although he did not commit any acts for which the agreement authorized a for-cause termination. Sanderson seeks: (a) $256,701.30, which includes his annual salary, the value of his health benefits, housing rental fees, retirement benefits for the remaining four years of the employment contract's term as well as $2,000 in back pay; and (b) "[r]eputational" and "intangible" damages. Taken as true, the above non-conclusory allegations establish that the amount in controversy exceeds $75,000. The Court finds that Sanderson made sufficient good faith allegations respecting the jurisdictional amount threshold, creating a rebuttable presumption that the actual amount in controversy exceeds $75,000. KRT failed to rebut this presumption, because it did not provide any evidence showing "to a legal certainty" that the amount sought does not meet the jurisdictional threshold. *See Scherer,* 347 F.3d at 397. Accordingly, the Court finds that it has subject matter jurisdiction over this action.

### Rule 12(b)(2) Lack of Personal Jurisdiction

#### Legal Standard

■ On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction. In contrast, when an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566–67 (2d Cir. 1996) (internal citations omitted).

"This prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 59 (2d Cir.2012) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 163 (2d Cir.2010)).

■ Three requirements must be satisfied for a federal court to have personal jurisdiction: (1) "the plaintiff's service of process upon the defendant must have been procedurally proper"; (2) "there must be a statutory basis for personal jurisdiction that renders such service of process effective"; and (3) "the exercise of personal jurisdiction must comport with constitutional due process principles." *Id.* at 59–60. "A district court's personal jurisdiction is determined by the law of the state in which the court is located." *Spiegel v. Schulmann,* 604 F.3d 72, 76 (2d Cir.2010). Here, New York law determines whether personal jurisdiction over KRT is available in New York, the state in which this district court is located.

There are two types of personal jurisdiction: general and specific.... "Specific jurisdiction," ... "depends on an 'affiliation between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." [*Goodyear Dunlop Tires Operations, S.A. v. Brown,* —— U.S. ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) ] (brackets omitted). Such jurisdiction is "confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.; see also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (discussing the terms). *Licci,* 673 F.3d at 60 n. 9.

New York's specific jurisdiction, codified in its long-arm statute provides, in pertinent part: "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... transacts any business with the state or contracts anywhere to supply goods or services in the state." New York Civil Practice Law and Rules ("CPLR") § 302(a)(1).

If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution. This analysis has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. With respect to minimum contacts, [the court] must determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction.... In determining the strength of the contacts under both section 302(a)(1) and the Due Process Clause, [the court] look[s] to the totality of Defendant['s] contacts with the forum state. With respect to [the court's] analysis of reasonableness as part of the due process inquiry, [the court] ask[s] whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice"—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case. Chloé, 616 F.3d at 164 (internal citations omitted).

"By this single act statute ... proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71, 818 N.Y.S.2d 164, 166–67, 850 N.E.2d 1140 (2006) (quotation marks and citation omitted). Under New York law, "the minimum contact [is characterized] as being 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" McKee Elec. Co. v. Rauland–Borg Corp., 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 37–38, 229 N.E.2d 604 (1967) (citation omitted). However, "New York's long-arm statute 'does not confer jurisdiction in every case where it is constitutionally permissible.'" Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 512, 851 N.Y.S.2d 381, 389, 881 N.E.2d 830 (2007) (citation omitted).

### Application of Legal Standard

KRT does not dispute that service was proper. Sanderson does not assert that KRT is subject to general personal jurisdiction, pursuant to CPLR § 301. He asserts that KRT is subject to specific personal jurisdiction, pursuant to CPLR § 302(a)(1). Since no discovery has taken place and no evidentiary hearing has been conducted, Sanderson "may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." Metropolitan Life Ins. Co., 84 F.3d at 566–67.

Here, Sanderson asserts in his complaint that KRT placed advertisements seeking to fill the executive director position in ArtSearch and ArtsOpportunities, both published by the Theatre Communications Group located in New York. Sanderson applied for the position, "while living in Brooklyn, New York, and domiciled in New York." Although Sanderson's interview for the position occurred in Kentucky, he alleges that during that interview he was told "that KRT defines success in the position of Executive Director in large part as transferring shows between KRT and New York," and by recruiting stars, such as "Diane Wiest, Jesse Green, Michael

Laurence, and Sam Shepard," all of whom "are based in New York." Sanderson was also told that KRT expects him to use "his New York contacts with the press, directors, actors, and New York theater network to assist KRT in producing and transferring shows to and from New York." Sanderson's contract negotiations with KRT occurred in February 2011, while he was in New York, "via telephone and mail," and, in New York, Sanderson signed and transmitted electronically to KRT a nonbinding Memorandum of Understanding, setting out the material terms of his employment with KRT. According to Sanderson, his contract required that he recruit theater industry personnel by using his connections in and traveling to New York, which is what he did, on behalf of KRT and in the course of performing his duties under the contract with KRT.

Sanderson's allegations establish that KRT transacted business in New York, within the meaning of New York's long-arm statute, when: (i) it advertised for the executive director position in New York; (ii) negotiated Sanderson's employment contract in New York, via telephone and mail; (iii) Sanderson, while in New York, signed the Memorandum of Understanding containing the material terms of the contract and transmitted it to KRT; (iv) it required Sanderson to use his connections to recruit theater industry personnel in New York in order to transfer shows between Kentucky and New York; (v) Sanderson used his connections in New York on behalf of KRT; (vi) Sanderson traveled to New York to hire and hired theater industry personnel in New York, on behalf of KRT; (vii) Sanderson contracted, on behalf of KRT, with Dash Media/PR, a New York public relations firm which obtained media coverage for KRT in New York; (viii) Sanderson brought shows from New York to KRT and from KRT to New York, on behalf of KRT; and (ix) it sent a letter to Sanderson, in New York, terminating his employment contract. Although the contract was executed in Kentucky, its materials terms were negotiated and Sanderson signed a document in New York memorializing them. The contract required that Sanderson perform a substantial number of activities in New York, which he did, on behalf of and with the approval of KRT. Therefore, although KRT did not enter New York, its activities in New York, including negotiating Sanderson's employment contract and the activities Sanderson performed, on KRT's behalf, as part of his executive director's job, were purposeful and a substantial relationship between KRT's New York transactions and Sanderson's claim is asserted in the complaint. *See Deutsche Bank Sec., Inc.,* 7 N.Y.3d at 71, 818 N.Y.S.2d at 166–67, 850 N.E.2d 1140.

KRT does not deny Sanderson's allegations, but contends that his "contacts in New York on behalf of KRT are irrelevant to this action of breach of the employment contract," and "[t]here is absolutely no relationship between KRT, New York and the specific type of litigation involved in this case." However, KRT fails to make citation to any authority for the proposition that "Sanderson's contacts in New York on behalf of KRT are irrelevant to this action of breach of an employment contract by termination," and, more specifically, KRT does not explain why the activities Sanderson performed in New York, under the contract, are irrelevant to determining KRT's contacts with New York and whether it is reasonable for the Court to exercise personal jurisdiction over KRT under the circumstances of this case.

With respect to the due process element of personal jurisdiction, the Court finds that the strength of KRT's contacts with New York was sufficient, such that those contacts justify the Court's exercise of personal jurisdiction over KRT in light of the

totality of KRT's contacts with New York. *See Chloé*, 616 F.3d at 164 ("In determining the strength of the contacts under both section 302(a)(1) and the Due Process Clause, we look to the totality of Defendant['s] contacts with the forum state."). Moreover, the assertion of personal jurisdiction, in this case, comports with traditional notions of fair play and substantial justice. That is so because it would be fundamentally unfair for KRT to negotiate and enter into an employment contract requiring Sanderson to conduct multiple activities in New York and for KRT to approve of the activities conducted on its behalf under that contract and, thereafter, to permit KRT to assert that those activities are irrelevant to the Court's determination of whether it has personal jurisdiction over KRT. Traditional notions of fair play and substantial justice warrant the Court in finding that, where KRT purposefully availed itself of the privilege of conducting a substantial number of activities in New York, it is appropriate to subject KRT to the personal jurisdiction of the Court. *See McKee Electric Co.*, 20 N.Y.2d at 382, 283 N.Y.S.2d at 37–38, 229 N.E.2d 604.

Furthermore, although KRT does not contend, in its memorandum of law, that subjecting it to personal jurisdiction in New York would impose any burden on it, KRT contends in its reply memorandum that, "[i]f KRT could not afford to pay Sanderson's salary," as he alleged in the complaint, "it could hardly be expected that KRT, a non-profit organization, could send its non paid board members and other witnesses to New York to testify," and "[a]ny cost to Sanderson to prosecute the case in Kentucky ... is heavily outweighed by the cost of KRT to defend in New York." KRT's attempt to use Sanderson's allegation that KRT could not pay his salary to support its argument that litigating this case in New York would impose a financial burden on KRT is frivolous be-

cause KRT's letter terminating Sanderson's employment states that Sanderson was terminated "after a report from [him] that KRT was financially unable to pay [his] salary," which KRT viewed as "slanderous and libelous."

■ "While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Chloé*, 616 F.3d at 165 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985)). KRT presented no arguments or other considerations that would render jurisdiction unreasonable in the circumstance of this case. Therefore, exercising personal jurisdiction over KRT comports with the Due Process Clause. The Court finds that Sanderson established that KRT is subject to the personal jurisdiction of the Court.

### Rule 12(b)(3) Improper Venue

#### Legal Standard

■ On a motion to dismiss for improper venue, pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, "[i]f the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of [venue]. But if the court holds an evidentiary hearing ... the plaintiff must demonstrate [venue] by a preponderance of the evidence." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir.2005). "The court must take all allegations in the complaint as true, unless contradicted by the defendants' affidavits." *McKeown v. Port Authority of New York and New Jersey*, 162 F.Supp.2d 173, 183 (S.D.N.Y.2001).

■ Sanderson alleges that venue lies in this court "because a substantial part of the events giving rise to the claim occurred in this District." "A civil action may be brought in … a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). "[T]he civil venue statute permits venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts." *Gulf Ins. Co.,* 417 F.3d at 356. The venue statute is construed strictly, which

> means for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere. It would be error, for instance, to treat the venue statute's "substantial part" test as mirroring the minimum contacts test employed in personal jurisdiction inquiries…. Courts making venue determinations in contract disputes have looked to such factors as where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred.

*Id.* at 357.

*Application of Legal Standard*

■ No evidentiary hearing was conducted in connection with this motion. The contract at issue does not contain a forum selection clause. Sanderson asserts a breach of contract claim, namely that KRT breached the contract when it terminated his employment "for cause," by a letter dated December 6, 2011, in contravention to the material terms of the contract, which provided that he can be terminated upon six-months prior written notice or "immediately for cause." The term "cause" is defined by the contract to mean that Sanderson "shall be found guilty of willful misconduct regarding duties under the agreement, dishonesty, or fraud AND OR any offense involving property, reputation, or goodwill of the THEATRE." Sanderson alleges that: (a) he was not provided with six-months prior written notice of his termination; (b) he did not commit or was alleged to have committed any acts enumerated under the term "cause" in the contract; and (c) he was never found guilty of any misconduct enumerated under the term "cause" in the contract. Sanderson's allegations about his efforts to recruit theater industry personnel in New York to perform for KRT and his activities in connection with bringing KRT to New York, are material to establishing that: (i) Sanderson is entitled to damages because he performed under the contract, while KRT did not; and (ii) his termination was wrongful.

KRT's contention that "[a]s an Executive Director, a primary function of his job is to get acts to come to KRT in Kentucky to entertain KRT's patrons" is not supported by any evidence. In addition, no evidence has been presented to support KRT's contention that Sanderson's contacts with New York "were ancillary to the performance of his duties and [sic] Executive Director." Therefore, Sanderson's allegation, that he discharged a substantial part of his duties by conducting various activities in New York, is not contradicted by any evidence and must be taken as true. *See McKeown,* 162 F.Supp.2d at 183. While the determination to terminate Sanderson's employment, a significant event material to the breach of contract claim, was made in Kentucky, the civil venue statute permits venue in this district as long as a substantial part of the underlying events took place in this district. *See Gulf Ins. Co.,* 417 F.3d at 356. Although the material terms of the contract were negotiated with Sanderson, via telephone and mail, while he was in Brooklyn, New York, which is in the Eastern District of New York, a significant part of the

508

contract at issue, material to the claim of its breach, was performed in this judicial district. Accordingly, the Court finds that Sanderson has made a *prima facie* showing of venue.

### CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction and improper venue, Docket Entry No. 6, is denied.

SO ORDERED.

